## Richard Watson Kear to use of The Safe Deposit Bank of Pottsville *v.* Edward M. Heilner, Appellant.

*Mortgage—Gambling contract—Margin—Question for jury.*

On a scire facias sur mortgage given by the defendant to one of a firm of stock brokers, a verdict and judgment for the plaintiff will be sustained where the defendant's testimony that he was induced by the mortgagee to execute the mortgage so as to secure money to put up as a margin in stock transactions is contradicted by several witnesses, one of whom testified that at the time the mortgage was executed it was explained to the defendant that the mortgagee would not lend the money if it was to be used for the purchase of stock on margins, and where it also appears that there were transactions between mortgagee's firm and the defendant other than those relating to stock transactions, and although the proceeds of the mortgage were paid over to the firm, they may have been applied on the other accounts.

Argued Feb. 15, 1899.    Appeal, No. 405, Jan. T., 1898, by defendant, from judgment of C. P. Schuylkill Co., Sept. T., 1891, No. 164, on verdict for plaintiff.    Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and FELL, JJ.    Affirmed.

Scire facias sur mortgage.    Before WEIDMAN, J.

At the trial defendant described the circumstances under which the mortgage was given as follows:

"I came into Barker & Kear's office on July 26, 1884, and Mr. Barker said to me, 'Ned, you must put up more margin, the stocks is running against you,' against us, I think, is the way he worded it; I says, 'Mr. Barker, I ain't got no more money to put up margins; well,' says I, 'close me out.'    Says he, 'There is no use closing you out because the stocks is bound to react; it will react in a few days,' and I told him I had no more money to put up; then he says, 'Come in back,' and we went back in the back office, and Mr. Kear was there and he says to me : 'Mr. Barker says,' says he, 'Mr. Kear will lend you the money by giving him a mortgage on your property;' says I, 'No, sir, I won't give no mortgage,' says I, 'If I give you a mortgage' says I 'it will be right out on the street.    Heilner's lost everything he had, he had to mortgage his property;' Mr. Barker says 'No, sir, nobody will ever know anything about it, we won't enter this mortgage up' and they just got talking to me about it, persuaded me right over and I gave the mortgage to them for to put up for margin, I think Mr. Kear went and got the mortgage drawed up, and he fetched it down and he told me to take it and get it acknowledged.    I done so, and he gave me his check for the $5,000, and I placed that check in Barker & Kear's hands, and they gave me credit for it and put it up for margins."

Defendant was contradicted by several witnesses.    One of them, James Ryon, testified as follows:

"A.  I think I came in the office a little bit sooner than Mr. Heilner, not very much, and Mr. Heilner came in and he handed the mortgage to me.    I said to Mr. Heilner, 'Mr. Kear is willing to loan you $5,000 but he would not loan you this amount if he knew that you intended to use it for the purchase of stocks on margins or any other transactions of that kind, and that it must be distinctly and expressly understood before the money

was delivered that Mr. Heilner was not borrowing it for that purpose and Mr. Kear was not lending it for that purpose.' "

It appeared that defendant had accounts with the firm of Barker & Kear other than those relating to stock transactions.

The court charged in part as follows :

This suit is founded upon a mortgage given by Edward M. Heilner, dated July 26, 1884, to R. W. Kear, for $5,000. It is admitted that there have been three payments of interest on this mortgage. The claim here is for $5,000, with interest from the date of the last payment, according to a statement which we have no doubt will be presented to you. It appears, however, that this mortgage was assigned to the Safe Deposit Bank of Pottsville, so that, as the suit stands, the claim is made by the Safe Deposit Bank against Heilner, the record of the suit being Richard Watson Kear now to the use of the Safe Deposit Bank of Pottsville. So far as the legal rights of the plaintiff are concerned it makes no difference whether the suit had been brought by Richard Watson Kear or by the Safe Deposit Bank. The assignee of the mortgage takes it subject to the equities that existed between the original parties ; that is to say, whatever equitable defenses the mortgagor might have made against the original holder of the mortgage, he can make against the assignee under the facts in this case.

The testimony of the defendant, Heilner, is explicit that, at the time that this mortgage was made, it was given as the result of a conversation with Barker, of the firm of Barker & Kear (Mr. Richard Watson Kear being the Kear of the firm), in which Barker insisted upon his putting up margins, and that he gave it to secure them under the persuasion of Mr. Barker. This persuasion, according to his statement, occurred on July 26. The daily balance shows that on July 25 there was a balance against Heilner, so that to that extent he is corroborated. The same book also shows that on the 26th there was a balance against him after the $5,000 were deposited, when the daily balances were added up. But Heilner is contradicted by several witnesses as to this particular point, Mr. Brown, Mr. George Barker, Mr. Kear, each with some distinctness, some positively, and Mr. Charles Barker himself testified that on July 26 he was not in Pottsville at all. Of course, if he was not in Pottsville, he could

not have had a talk with him on that day. In addition to that is the testimony of Judge Ryon, in which he said he notified Heilner and Kear the time that the mortgage was delivered, and when the check was passed over, that it was understood that this was not to be used in any speculation or in any margin transaction. Judge Ryon correctly stated the law for the security of Mr. Kear. According to Mr. Kear, he (Kear) supplemented that by saying to Mr. Heilner, " This is your money ; you can do with it what you please."

Though you might be satisfied in this case that the transaction with regard to stocks that were going on between the firm of Barker & Kear and Heilner were speculations on margin, without the intention to deliver the certificates at all, and in every respect what the law designates, gambling contracts, still that would not prevent these parties from having an honest transaction about another matter. If you believe that this transaction had no reference to their other transactions, that it was honest, not connected with margins or speculation, not advanced for the purpose of using it in gambling transaction for payment of past, or the security for future margins ; if you believe that the transaction was entirely separate from such operations, the plaintiff ought to recover. But in our judgment you are not bound by what occurred simply at that time. You can take into consideration what occurred afterwards. You can go behind the mere form of the transaction and determine whether these parties had in view the purpose which is denounced by the law, or whether, not having it in view at the time, they subsequently made an illegal or improper appropriation of the money. Mr. Kear was a member of this firm. The testimony shows that, within a few minutes after the time that the check was handed by Mr. Kear to Mr. Heilner with this remark that it was his and he could do with it as he pleased, Heilner handed it to Mr. Kear, and it was appropriated, or at least it was deposited, with Barker & Kear.

The law of this state is that, even if you should believe that the execution and delivery of the mortgage and the giving of the check were free from any connection with those transactions with regard to stocks, yet if you believe that Mr. Kear, a member of this firm, within a few moments afterwards applied it to the payment of margins, there would be such a connection be-

tween the transactions that, in the policy of the law, would prevent a recovery by the plaintiff in this case.

In answer to that the statement is made that there was no deposit of this money to pay those accounts or margins standing, that it was simply a deposit made on the general account. We want to say here that, in our view of the matter, the transactions with reference to stocks that were taking place at the time that this mortgage transaction occurred, that is, on July 26, between these parties, would come within the condemnation of the law; that they were not such as were lawful, and could not be the consideration for a mortgage which would justify a recovery by the plaintiff in this case. We say this because there is no evidence that either Barker & Kear or Heilner understood that there was to be any delivery of any certificates of these stocks that were on the books at that time. Heilner swears that there was no talk about delivery, and we understand the witnesses for the plaintiff to say the same thing, this is, so far as Heilner and the firm of Barker & Kear were concerned. It has been ruled in Pennsylvania that what the customs were in such transactions with a third party (the agent of the broker who dealt directly with Heilner in this case) would not give a different color to the transaction.

In order that we may make plain to you the ground upon which we state that, we will read from some of the definitions that are given in our books. In Gaw v. Bennett, 153 Pa. 247, it is said that a wagering contract is one in which the parties in effect stipulate that they shall gain or lose upon the happening of an uncertain event in which they have no interest except that arising from the possibility of such gain or loss. In Maxton v. Gheen, 75 Pa. 166, it is said that a transaction in stocks by way of margin, settlement of differences and payment of gain or loss, without intending to deliver stock, is a mere wager. Where there was a contract to buy and sell stocks which were delivered and the contract carried into execution it was not illegal. When stocks are bought and sold upon speculations, if they are to be delivered, it is not a gambling transaction. Further, in Peters v. Grim, 149 Pa. 164, Judge MITCHELL says that if there was not under any circumstances to be a delivery as part of and completing a purchase, then the transaction was a mere wager on the rise and fall of prices, but

if there was in good faith a purchase, then the **delivery** might be postponed or made to depend upon a future condition, and the stock carried on margin or otherwise in the meanwhile without affecting the legality of the operation.

The testimony fails to show that there was an arrangement that the delivery had been postponed or had been made to depend upon any future condition or that the certificates were to be delivered at all. We are aware that in one of the later cases, Gaw v. Bennett, 153 Pa. 247, it is said that whether the contract is a wagering one or not is a question for the jury unless the entire contract, unexplained, by oral testimony, is in writing. We do not find in the facts of the case a warrant for overruling the theory expressed, as we understand, in Dickson's Executor v. Thomas, 97 Pa. 278, in which the court held as a matter of law that where there was a contract for the purchase of stocks, buyers' option, and there was no contract or understanding about delivery, that it was the duty of the court to say so, and in that case they reversed the judge below for submitting the question to the jury. We say to you as a matter of law that it is our conclusion that to have loaned the money for the purpose of paying the margin due at that time, that is, on July 26, or for Mr. Kear, who was a member of the firm, to have appropriated this sum of money borrowed on that day ($5,000), to the payment of those balances or margins ought to defeat the recovery of the plaintiff in this case.

It then becomes a matter of importance for you to determine whether there was such an appropriation. On the book called the daily balance book it appears that there was an account of stock and in lead pencil; alongside of that is the entry "check $5,000." There is no dispute that is the same amount of money. [The ledger account shows that from at least July 1 to July 26, there was no other matter that was active in the account except stock. It is true that $1,000 was paid by Barker & Kear to Heilner. If there were no other open account between them, and these entries satisfy you that such an appropriation was made by Kear, he, as a member of the firm of Barker & Kear, would be charged with knowledge of such an illegal appropriation, and it would defeat his recovery, and it must defeat the recovery of the Safe Deposit Bank in this case.] [3]

[However, in order to dispute this appropriation, they have

called attention to this whole account, and they have claimed that it was not simply an account of transactions with regard to stock; they have offered this evidence to show that there were relations between them different from those as between a mere broker and a customer; that this account embraces the mortgage, for instance, and that it embraces moneys which were paid out by check, showing that Heilner was acting with these people, not only as a customer in their brokerage business, but that they were also acting for him as his banker. It also appears in the case, and you must consider that evidence in this connection, that Heilner paid them money in checks on another bank, we think the Safe Deposit Bank and on the Miners' Bank. You must also bear in mind that these checks are not in the usual form which would be given in transactions between a bank and its depositor, the checks are not drawn by Heilner on the bank, but they are drawn by Barker & Kear to the order of Heilner. There is no dispute that he got the money; therefore we do not think it necessary to say more about it.

How far the argument has satisfied you that he got more money than he paid in is a matter for you to determine; we mean on the mere question of these accounts; whether he paid in and checked on that as if it were a bank account, or whether these payments were simply made from time to time out of the profits of the business as it stood in these speculations. We understood it to be admitted that the mortgage was paid on February 27, 1884, that is the first mortgage of five thousand seven hundred and some dollars. You must take into consideration these facts in order to determine whether this was an appropriation of this money toward the payment of the margin on these speculations.] [4]

So far as the dealings in stock were concerned, there is no evidence that we remember of any dealings in which the certificates were delivered, except those that were purchased in the earlier transactions. And for some time, as we have already said, there was no arrangement between them that there should be any delivery of certificates. So that, if it was appropriated to the payment of margins, and so appropriated with Kear's knowledge, as a member of the firm of Barker & Kear, we think that such an appropriation would vitiate the contract and prevent his recovery on the mortgage, and, preventing his recovery,

would prevent the recovery of his assignee, the Safe Deposit Bank.

Verdict and judgment for plaintiff for $6,843.93. Defendant appealed.

*Errors assigned* among others were (3, 4) above instructions, quoting them.

*Guy E. Farquhar,* for appellant, cited Dickson v. Thomas, 97 Pa. 278; Waugh v. Beck, 114 Pa. 422.

*S. H. Kaercher,* with him *D. W. Kaercher,* for appellee, cited Smith v. Bouvier, 70 Pa. 325; Gaw v. Bennett, 153 Pa. 247; Thomas & Sons v. Loose, Seaman & Co., 114 Pa. 35; Honesdale Glass Co. v. Storms, 125 Pa. 268; Hogan v. West Mahanoy Twp., 174 Pa. 352; Fareira v. Gabell, 89 Pa. 89; Smith v. Kammerer, 152 Pa. 98; Hopkins v. O'Kane, 169 Pa. 478; Hendrickson v. Evans, 25 Pa. 441; Allebach v. Hunsicker, 132 Pa. 351; Evans v. Dravo, 24 Pa. 62; Wright v. Pipe Line Co., 101 Pa. 204; Holt v. Green, 73 Pa. 198.

PER CURIAM, March 13, 1899:

Our consideration of this record has not convinced us that there is any error therein that would justify a reversal of the judgment. The defense that was interposed depended on questions of fact which were fairly and correctly submitted to the jury, and by them determined in plaintiff's favor. We find no substantial error in the learned trial judge's rulings on questions of evidence, or in the instructions contained in his charge and answers to points. The case appears to have been carefully and correctly tried, and the judgment should not be disturbed.

Judgment affirmed.